IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-2455-RBJ

DEBORAH OSBURN,

      Plaintiff,

v.

ANDREW SAUL, Acting Commissioner of Social Security,

      Defendant.

---

## ORDER

---

This matter is before the Court on review of the Social Security Administration ("SSA") Commissioner's decision denying claimant Deborah Osburn's applications for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI"). Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons explained below, the Court reverses the Commissioner's decision.

### STANDARD OF REVIEW

A person is disabled within the meaning of the Social Security Act only if her physical and/or mental impairments preclude her from performing both her previous work and any other "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2). To be disabling, a claimant's conditions must be so limiting as to preclude any substantial gainful work for at least twelve consecutive months. *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

This appeal is based upon the administrative record and the parties' briefs. In reviewing

a final SSA decision, the District Court examines the record and determines whether it contains

substantial evidence to support the decision and whether SSA applied correct legal standards.

*Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).  The District Court's determination of

whether the ruling by the Administrative Law Judge ("ALJ") is supported by substantial

evidence "must be based upon the record taken as a whole."  *Washington v. Shalala*, 37 F.3d

1437, 1439 (10th Cir. 1994).  A decision is not based on substantial evidence if it is

"overwhelmed by other evidence in the record."  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir.

1988).  Evidence is not substantial if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966

F.2d 1371, 1374 (10th Cir. 1992).  Reversal may be appropriate if the Commissioner applies an

incorrect legal standard or fails to demonstrate that the correct legal standards have been

followed.  *Winfrey*, 92 F.3d at 1019.

## BACKGROUND

### A.  <u>Factual Background</u>

Ms. Osburn is a fifty-seven-year-old woman who initially applied for disability benefits

alleging that she was disabled due to a sciatic nerve low back injury and a right arm fracture that

prevented her from raising her arm and caused diminished strength.  R. 227.  Since filing her

initial disability application on December 22, 2015 she has been diagnosed with a right rotator

cuff tear, acromioclavicular joint arthritis in her right shoulder, osteopenia, lumbar disc disease,

and schizoaffective disorder, bipolar type.  R. 283, 347, 531, 908, 1145.  Prior to the onset of her

disability, Ms. Osburn worked as a telemarketer, cashier, salesperson, food cart vendor, and

seasonal FedEx parcel assistant.  R. 279–80.

On May 27, 2015 Ms. Osburn met with her primary care provider (PCP), Pooneh

Shahmohammadi, MD, of Kaiser Permanente, complaining of pain in her right shoulder joint and

both hips following a fall on her right shoulder at Sam's Club. R. 393. On examination the PCP found signs of positive impingement and pain at the high arc of abduction and forward flexion. Dr. Shahmohammadi referred Ms. Osburn to physical therapy for the pain and ordered x-rays of her shoulder, pelvis, and lower back. R. 397–98.

On August 17, 2015 Ms. Osburn discussed the results of August 10, 2015 x-rays of her right shoulder, pelvis, and lumbar spine with Dr. Shahmohammadi. R. 405, 411–12. The shoulder x-ray showed mild to moderate degeneration in Ms. Osburn's glenohumeral and acromioclavicular shoulder joints. R. 412. The pelvis x-ray revealed "marked osteitis pubis" (inflammation) and "mild superior marginal acetabular osteophyte formation" (bony projections) in Ms. Osburn's hip joints. R. 411. Finally, the spine x-ray showed that Ms. Osburn had multilevel endplate spondylosis throughout her lumbar and visualized lower thoracic spine; facet degenerative changes in her mid and lower lumbar spine; minimal dextroconvex lumbar scoliosis; and pseudoarticulation formed by the L5 vertebra and left sacral ala. *Id.*

During a follow-up appointment at Kaiser Permanente later that day, Ms. Osburn complained of pain in her lower back, right hip, and right shoulder and told Andrea Anderson, NP, that she had experienced chronic pain since a fall five years prior. R. 410. Ms. Anderson ordered an MRI of Ms. Osburn's pelvis and referred Ms. Osburn to neurosurgery for further evaluation of her spine and to physical therapy for the pain. R. 408–09, 412. The Kaiser Permanente Department of Neurology subsequently advised Ms. Osburn to try "conservative approaches" to addressing her lower back pain, such as physical therapy and massage. R. 418.

On October 29, 2015 Ms. Osburn had an MRI of her pelvis. R. 420. The MRI confirmed the presence of marked osteitis pubis and showed mild osteitis "along the caudal aspect of the right sacroiliac joint with no discrete cartilage erosion," raising the possibility of inflammatory

arthropathy.  R. 421.  Based on the MRI results and Ms. Osburn's continued lower back pain, on November 17, 2015 Dr. Shahmohammadi referred her to the orthopedics department and ordered an MRI of Ms. Osburn's lumbar spine.  R. 425–26.

On November 30, 2015 Ms. Osburn fell while stepping out of her car.  R. 611.  She presented to the University of Colorado Emergency Department ("ED") complaining of severe pain and limited range of motion in her right shoulder.  *Id.*  The ED physician who examined Ms. Osburn noted "diffuse tenderness over [her] entire upper humerus, scapula and clavicle," as well as pain with all shoulder movement.  R. 613.  Reviewing x-rays of Ms. Osburn's shoulder taken during her ED visit, the physician did not see evidence of any acute fractures or dislocations.  *Id.* The x-rays did show "minor degenerative changes involving the acromioclavicular joint and rotator cuff attachment surface of the greater tuberosity."  R. 320.

On December 9, 2015 Ms. Osburn met with Richard B. Sisson, MD, of Kaiser Permanente's Orthopedics Department for a consultation regarding the pain in her right shoulder, lower back, right hip, and right leg.  R. 436.  Dr. Sisson found that Ms. Osburn had a grossly normal range of motion in both hips, but that she had pain in the lumbosacral area, particularly on the right side, as well as tenderness in the greater trochanters on both sides of her hips, tenderness over the ischial tuberosity, and a negative straight leg raise test on both sides.  R. 438. He also found that it was difficult for Ms. Osburn to lift her arm out and away from her body due to shoulder pain.  R. 437.  X-rays taken of Ms. Osburn's shoulder that day showed "osteoarthritic changes to the [acromioclavicular] joint with undersurface acromion spurring, degenerative changes in the greater tuberosity suggestive of chronic tendinopathy, [and] a subtle irregularity in the posterior glenoid . . . that may relate to some degenerative changes or previous traumatic injury."  R. 438–39.  They did not reveal any acute bony abnormalities or fractures.  *Id.*

To address Ms. Osburn's lower back and right lower extremity pain, Dr. Sisson referred her to physical therapy and asked her to follow through with the lumbar spine MRI and neurosurgery referral previously ordered by her PCP.  R. 438.  He also ordered an MRI of her shoulder and asked Ms. Osburn to follow up with his office in several weeks.  R. 439.

On December 20, 2015 Ms. Osburn had MRIs of her lumbar spine and right shoulder.  R. 318–19.  The imaging of Ms. Osburn's lumbar spine showed multilevel degenerative changes and "moderate left foraminal narrowing at L3–4 with mild mass effect on the left extraforaminal L3 nerve root secondary to asymmetric circumferential disk bulge."  R. 319.  The MRI of her right shoulder revealed "massive" tearing in her rotator cuff, with complete ruptures of the distal supra- and infraspinatus tendons, retraction of the torn tendons, and mild atrophy of the supraspinatus musculature.  R. 317–18.  The shoulder MRI also showed tendinosis of the intra-articular biceps tendon and large shoulder effusion with robust synovitis.  *Id.*  Based on these MRI results Dr. Shahmohammadi referred Ms. Osburn for a surgical consult.  R. 445.

On February 5, 2016 Ms. Osburn had a pre-operative physical exam with orthopedic surgeon Mark W. Melberg, MD, at Kaiser Permanente, during which her diagnosis was confirmed to be a right rotator cuff tear and acromioclavicular joint arthritis in her right shoulder.  R. 283, 347.  Ms. Osburn told Dr. Melberg that she had difficulty dressing and grooming due to the pain and weakness in her shoulder.  R. 456.  She described the pain as constant and throbbing, made worse by movement, and said that it caused her to have trouble sleeping on a nightly basis.  *Id.*  She also told the doctor that she experienced tingling throughout her right arm and hand, as well as occasional cramping in her hand.  *Id.*  Dr. Melberg noted that Ms. Osburn could not actively elevate her arm beyond 20 to 30 degrees and was forced to use her left arm to raise and hold up her right arm in order to do activities of daily living.  R. 347.  The doctor found

some "subacromial crepitation that [was] painful with passive motion" and tenderness over the acromioclavicular joint, the anterior and lateral aspects of the rotator cuff, and the trapezius muscle.  *Id.*  He also found that Ms. Osburn had moderate to severe weakness with moderate pain on resisted external rotation of her right arm, but that she had full movement of her elbow and fingers and "good strength on resisted shoulder abduction, internal rotation, and elbow flexion."  *Id.*

On February 8, 2016 Ms. Osburn underwent a right shoulder arthroscopy to repair her rotator cuff at St. Joseph's Hospital.  R. 341.  On the same day she had a DEXA bone density scan, which showed that she was suffering from osteopenia.  R. 531.  On February 22, 2016 Ms. Osburn attended a post-operative follow-up exam with Dr. Melberg at Kaiser Permanente.  R. 488.  During this appointment she rated her pain as eight or nine out of ten, but she experienced minimal pain and difficulty when her passive range of motion was checked and she walked with a normal gait and no sling.  *Id.*  Dr. Melberg referred her to physical therapy and advised her to wear a sling at all times.  R. 488–89.

On March 17, 2016 Ms. Osburn attended a follow-up appointment with Dr. Melberg.  R. 496–97.  She told the physician that her pain had improved to a tolerable level, although she reported taking six Tramadol a day in addition to regular Ibuprofen and said that she continued to have some difficulty sleeping at night.  R. 496.  She also expressed concerns about a popping sensation in her shoulder.  *Id.*  On examination, Dr. Melberg observed that the shoulder wound appeared to have healed without infection.  R. 497.  He found Ms. Osburn's early post-surgical progress to be satisfactory and told Ms. Osburn that she could wean herself from the sling and return to driving if she felt comfortable.  *Id.*  However, Dr. Melberg expressed concern that she had not complied with restrictions on active range of motion or attended physical therapy.  *Id.*

He asked her to follow through with physical therapy and instructed her to avoid lifting more than ten pounds with her right arm at her side and more than five pounds with her arm raised. *Id.*

On April 27, 2016 Ms. Osburn was seen at the University of Colorado Emergency Department after being involved in a low-speed motor vehicle accident in a parking lot. R. 614, 616. Ms. Osburn presented to the ED complaining of right shoulder pain. R. 614. X-rays of her shoulder and thoracic spine showed "[p]ostsurgical changes consistent with history of rotator cuff injury and repair," as well S-shaped scoliotic curvature of the spine, but no shoulder dislocation or fracture and no spinal injury. R. 616.

Several days later, on May 2, 2016, Ms. Osburn called Dr. Melberg's office complaining of pain and tingling in her right shoulder and arm following the car accident. R. 678. One week later, she attended a three-month post-operative follow-up appointment with Dr. Melberg. R. 680. Ms. Osburn told the doctor that since the accident she had been experiencing pain on the right side of her neck and in her right shoulder and elbow. R. 682–83. She reported that her symptoms felt similar to what she experienced prior to her rotator cuff surgery and that she was taking Oxycodone five times a day. R. 683. Dr. Melberg noted tenderness along Ms. Osburn's cervical spine, clavicle, right shoulder, and elbow. *Id.* He ordered an x-ray of Ms. Osburn's right shoulder, which showed post-operative changes but no acute bony injury. *Id.* Finding no evidence that Ms. Osburn's rotator cuff repair had been significantly impaired, Dr. Melberg recommended that she return to physical therapy to treat her neck and shoulder pain, slowly increase her activity as her pain allowed, and follow up with her PCP. R. 683–84.

On July 13, 2016 Ms. Osburn met with Dr. Shahmohammadi for a routine physical examination and reported that she was experiencing insomnia and chronic lower back pain but no acute issues. R. 707–08. In December 2016 Ms. Osburn called Dr. Shahmohammadi's office

to request a refill of a Hydrocodone prescription, which was granted.  R. 892–93.  On December 28, 2016 she met with Dr. Shahmohammadi in person, complaining of increased back pain.  R. 900.  The PCP noted that Ms. Osburn experienced pain in her back with motion and recorded a positive straight-leg test on her right side.  R. 901.  She again prescribed Hydrocodone and referred Ms. Osburn to physical therapy and neurosurgery for her back pain.  R. 899.

In early February 2017 Ms. Osburn attended a consultation with Ranee Shenoi, MD, of Kaiser Permanente's Department of Neurology.  R. 906–09.  Ms. Osburn reported that she had pain in her right lower back and in both hips that worsened with walking, standing, and sitting, as well as weakness in her right leg and numbness and tingling in her right hip and thigh.  R. 906.  She told Dr. Shenoi that she frequently lost her balance and fell, and that she had been using a cane for about eight months.  *Id*.  During a physical exam Dr. Shenoi found that Ms. Osburn had a normal range of motion in her lumbar spine and hips but noted tenderness in the right sacroiliac joint, over both greater trochanters, and in the lumbar spine around L3-4 and L4-5.  R. 907.

Based on her physical examination and Ms. Osburn's medical records, Dr. Shenoi diagnosed Ms. Osburn with right sacroiliac joint pain, right L4-5 facet dysfunction, bilateral greater trochanteric bursitis and pain, and lumbar disc disease in L3-4 with left foraminal narrowing.  R. 908.  The doctor noted that she did not see any neurological findings that would explain Ms. Osburn's reported imbalance or any evidence of the inflammatory arthropathy suggested by her October 2015 pelvis MRI.  *Id*.  Dr. Shenoi referred Ms. Osburn to physical therapy and recommended that she follow up with her PCP about using nonsteroidal anti-inflammatory drugs for pain management, that she have a sacroiliac joint injection in her right hip, and that she try water-walking and Pilates.  R. 906–09.

On October 19, 2017 Ms. Osburn had a telephone appointment with her PCP's office, during which she was instructed to try physical therapy and was prescribed Cymbalta for pain. R. 981.  On November 15, 2017, Ms. Osburn had another telephone appointment, this time with Dr. Shahmohammadi.  R. 988.  Dr. Shahmohammadi referred her to physical therapy for her lower back pain and, at Ms. Osburn's request, prescribed a muscle relaxant to help with pain Ms. Osburn reported experiencing as a result of the car accident in April 2016.  R. 988.

In late November 2017 Ms. Osburn met in person with Dr. Shahmohammadi, complaining of chronic back and hip pain as well as increased back pain and feet numbness in the month leading up to the appointment.  R. 996.  She told the physician she did not wish to proceed with the sacroiliac joint injection recommended by Dr. Shenoi earlier in the year.  *Id.* Dr. Shahmohammadi referred Ms. Osburn to the Department of Neurology again and ordered an electromyogram, an MRI of Ms. Osburn's lower spine, an x-ray of her right hip, and a variety of other labs.  R. 992–95.

On December 20, 2017, Ms. Osburn attended a Social Security disability evaluation conducted by orthopedic surgeon Peter L. Weingarten, MD, at the request of the SSA.  R. 966–978.  Dr. Weingarten physically examined Ms. Osburn and took x-rays of her right wrist and hand, right hip, lumbar spine, and both shoulders.  R. 971–92.  He ascribed changes visible in the right shoulder x-ray to Ms. Osburn's rotator cuff repair surgery.  R. 971.  However, he found that the right wrist and hand x-rays were unremarkable and that the right hip x-rays showed little to no arthritic change, noting that the sacroiliac joint also appeared unremarkable.  R. 971–92.  He also found that the lumbar spine x-rays showed mild to moderate diffuse degenerative changes. R. 972.

Dr. Weingarten noted that during the consultation Ms. Osburn manifested significant anxiety and was unable to sit or stand for prolonged periods of time. R. 972. He found that she was "highly unstable with poor balance when standing or walking" and observed that she walked carefully using a cane. R. 971. He characterized his examination of Ms. Osburn's hip as "benign." *Id.* Although Ms. Osburn had no spasms or tenderness in her lower back, her ability to hyperextend or laterally twist her back was limited and painful. *Id.* Dr. Weingarten found that she was experiencing "chronic low back symptomatology" that substantially limited her. R. 972. He also found that Ms. Osburn had full range of motion and "good strength" in her left shoulder but a notable loss of motion in her right shoulder, accompanied by weakness and pain. *Id.* Finally, he found that Ms. Osburn's use of her right hand was limited by her inability to actively flex the metacarpophalangeal or interphalangeal joints of her right thumb, perhaps due to a past surgery on her wrist and thumb. *Id.*

In light of his evaluation, Dr. Weingarten concluded that Ms. Osburn could lift and carry up to 10 pounds frequently, up to 20 pounds occasionally, and never more than 20 pounds. R. 973. He found that she could sit and stand for 30 minutes continuously and for no more than four hours total in an eight-hour workday. R. 974. He also found that she could walk for 10 minutes continuously and for no more than four hours total in an eight-hour workday, but he noted that she needed to use a cane to walk more than 30 feet due to her history of falls. *Id.* Dr. Weingarten determined that Ms. Osburn could frequently reach, handle, finger, feel, and push/pull with her left hand, but that with her right hand she could frequently feel and push/pull only and occasionally reach, handle, and finger. R. 975. Finally, Dr. Weingarten concluded that Ms. Osburn could occasionally climb stairs and ramps with assistance, but that she could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. R. 976.

Three months later, on March 1, 2018, Ms. Osburn visited a Kaiser Urgent Care complaining of left shoulder joint pain and bug bites on her left shoulder from being bitten by bugs in her basement.  R. 1024–26.  The examining physician noted that she had a decreased range of motion in her left shoulder, with pain on motion and tenderness around the joint.  R. 1027.  She had a normal range of motion in her neck and right shoulder.  *Id.*

On March 22, 2018 Ms. Osburn had a meeting with Dr. Shahmohammadi, during which she cried and said that she had been hallucinating for several months.  R. 1030.  The PCP conducted a neurological exam, which was normal, and instructed Ms. Osburn to start taking Seraquel instead of Doxepin and to follow up with the Mental Health Center of Denver.  R. 1030–31.  She also ordered a CT scan of Ms. Osburn's head, which was unremarkable.  R. 1107–08.

On April 19, 2018 Ms. Osburn attended an ophthalmology appointment with Maxwell Pettijohn, OD, of Kaiser Permanenete.  R. 1039.  Dr. Pettijohn found that Ms. Osburn was experiencing age-related macular degeneration that could have caused some visual disturbance but noted that this "would not explain all hallucinations or inability to rationalize."  *Id.*

On June 12, 2018 Ms. Osburn met with Nereida Despain, RN, at Kaiser Permanente.  R. 1065.  She told Ms. Despain that she would like a mental health services referral because she was dealing with substantial stress and anxiety at home, was very forgetful, and had begun to hallucinate that there were people and aliens in her home.  *Id.*

On August 7, 2018 Ms. Osburn attended a consultation with Eric Meyer and Kathleen Gill, RN, at the Mental Health Center of Denver.  R. 1124.  Ms. Osburn told the evaluators that her house had been broken into in September 2017 and that since then spirits or demons in her home prevented her from sleeping.  R. 1121, 1125.  She also said that she had been diagnosed

with bipolar disorder decades before but had never taken any medications for the condition, and that she had recently been diagnosed with dementia.  R. 1125.

The next day, Ms. Osburn visited Aurora Mental Health Center for an additional consultation.  R. 1162.  She repeated what she had told the clinicians at the Mental Health Center of Denver and provided details of additional hallucinations.  *Id.*  Following the appointment at Aurora, Ms. Osburn returned to the Mental Health Center of Denver claiming that a demon had entered her body and that other entities were in her car.  R. 1129.

Following the ALJ's unfavorable decision on September 19, 2018 Ms. Osburn continued to seek treatment at Kaiser Permanente and the Mental Health Center of Denver.  On October 15, 2018 she called her PCP's office to request a follow-up appointment for her ongoing hallucinations and documentation reflecting her past bipolar disorder diagnosis.  R. 1067.  Dr. Shahmohammadi recommended that Ms. Osburn follow up with her mental health care team.  *Id.*

On February 19, 2019 she presented at Kaiser Permanente complaining of severe abdominal pain, lower back pain, and vomiting.  R. 1068, 1170.  An abdominal ultrasound showed a diffuse increase in echogenicity throughout Ms. Osburn's liver that likely represented fatty infiltration of the liver. R. 1109, 1171.

On February 20, 2019 Ms. Osburn attended a follow-up appointment with her PCP.  R. 1182.  She reported continued hallucinations and lower back pain and said that she had not followed up with her mental health care providers.  *Id.*  During a physical examination, Dr. Shahamohammadi noted that Ms. Osburn had no tenderness in her sacroiliac joints, sciatic notches, or right hip, that she had a positive straight leg raise on her right side, and that her bilateral lower extremity reflexes, strength, and sensory exam were all normal.  R. 1086.  She referred Ms. Osburn to physical therapy for her continued low back pain.  R. 1082.

In February and March 2019 Ms. Osburn was seen twice by Emily Kahn at the Mental Health Center of Denver.  R. 1145, 1152–53.  Ms. Kahn diagnosed Ms. Osburn with schizoaffective disorder, bipolar type; PTSD; and moderate alcohol use disorder.  R. 1145.

### B.  Procedural Background

Ms. Osburn completed her application for SSDI on December 22, 2015 and her application for SSI on February 5, 2016.  R. 13.  After SSA denied her initial applications on August 19, 2016, she requested a hearing which was held before ALJ Jennifer A. Simmons on May 29, 2018.  *Id.*  An impartial vocational expert testified at the hearing, and Ms. Osburn was represented by counsel.  R. 32–76.  The ALJ issued an unfavorable decision on September 19, 2018.  R. 10–27.  Ms. Osburn then asked the Appeals Council to review the decision, but her request was denied on July 26, 2019, making the ALJ decision final.  R. 1–7.

Ms. Osburn filed a timely complaint and petition for review in this Court on August 29, 2019.  ECF No. 1.  On December 9, 2019 she submitted an opening brief.  ECF No. 14.  On January 29, 2020 the Commissioner responded to Ms. Osburn's brief, ECF No. 18, and on February 10, 2020 Ms. Osburn filed a reply, ECF No. 19.  The Commissioner then moved for leave to file a sur-reply brief to reply to new legal arguments raised in Ms. Osburn's reply brief.  ECF No. 22.  This Court granted the motion and the Commissioner filed a sur-reply brief on February 21, 2020.  ECF No. 24.  This appeal is now ripe for review.

### C.  The ALJ's Decision

After evaluating the evidence of Ms. Osburn's alleged disability according to SSA's standard five-step process, the ALJ issued an unfavorable decision.  R. 10–27.  Preliminarily, the ALJ found that Ms. Osburn met the insured status requirements of the SSA through December 31, 2015.  R. 15.

At step one, the ALJ found that Ms. Osburn had not engaged in any substantial gainful activity ("SGA") since September 10, 2015.  *Id.*  She found that although Ms. Osburn did work after the alleged disability onset date, this work did not rise to the level of SGA.  *Id.*  Although Ms. Osburn testified that she helped her brother operate his food cart for several hours a day over the course of five months, she did not work for pay because she owed him money.  R. 16.

At step two, the ALJ found that Ms. Osburn had the following severe impairments: lumbar/thoracic spine degenerative disc disease; status post right rotator cuff surgery; mild hip osteitis; and history of obesity during the relevant period.  *Id.*  The ALJ found that Ms. Osburn had the following non-severe impairments: vision impairment; "left shoulder issues"; and osteopenia.  *Id.*  Ms. Osburn also testified that she experienced problems with dyslexia, dementia, and mental health.  R. 16–17.  The ALJ found that there was no corresponding evidence to support any findings of impairment relating to a learning disability or dementia and insufficient evidence to support a finding of medically determinable mental health impairment or non-severe mental health impairment.  R. 17.

At step three, the ALJ found that Ms. Osburn's impairments did not meet or medically equal the severity of one of the listed impairments in 20 CFR 404, Subpart P, Appendix I (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  *Id.*  The ALJ found that Ms. Osburn did not meet the requirements under Listing 1.02 (Major dysfunction of a joint(s)), because there was "no evidence of involvement of one major peripheral joint in each upper extremity resulting in inability to perform fine and gross movements effectively."  R. 18. The ALJ found that Ms. Osburn did not meet the requirements under Listing 1.04 (Disorders of the spine), because there was "no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by

sensory or reflex loss, and positive straight-leg raising test; spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication with inability to ambulate effectively." *Id.* Finally, although the ALJ considered Ms. Osburn's obesity to be severe during the period at issue, she found that it was not accompanied by the "specific clinical signs and diagnostic findings required to meet or equal the requirements" of any of the listings affected by obesity. *Id.*

At step four, the ALJ found that Ms. Osburn had the residual function capacity ("RFC") to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). *Id.* Specifically, the ALJ found she could lift, carry, push, or pull 50 pounds occasionally and 25 pounds frequently. She could sit, stand, and walk with no limitations, but she could not reach overhead with her upper extremities, climb ladders, ropes, or scaffolds, work at heights, or drive for work. She could crawl on an occasional basis. *Id.*

In reaching this conclusion, the ALJ evaluated notes made by Ms. Osburn's health care providers, the results of the objective medical tests available in the medical record, and the opinion of medical consultant Dr. Peter Weingarten. She emphasized Ms. Osburn's apparent failure to follow through with repeated referrals for physical therapy, imaging, and other treatment instructions, finding that this failure "lessen[ed] the persuasiveness of disabling-type symptomatology for her physical impairments." R. 20–23. The ALJ also repeatedly highlighted health care provider notes that either described Ms. Osburn's gait as normal or failed to indicate any gait impairment or cane use. *Id.* Ultimately the ALJ found that Ms. Osburn's allegations were undermined by "the chronic issues with compliance, the sporadic treatment, the less than significant exam findings, and [the] claimant's considerable varied and inconsistent reports/complaints to treatment providers [that were] replete throughout the record . . . ." R. 23.

The ALJ was "unpersuaded" by the opinion of Dr. Weingarten, who examined Ms. Osburn once in December 2017 and concluded that Ms. Osburn was limited to lifting and carrying light weights, needed to walk with a cane, could not perform postural activities other than climbing stairs or ramps with assistance, and had limited use of her right hand.  R. 24. Specifically, the ALJ gave little weight to Dr. Weingarten's opinion because he examined Ms. Osburn only once and "seemed to rely heavily on the claimant's complaints, which were not fully supported by the objective exam."  R. 24–25.  The ALJ questioned Dr. Weingarten's conclusion that a cane was medically necessary, noting that the recommendation seemed to contradict his assessment that Ms. Osburn could "be on her feet up to 8 hours in an 8-hour workday (stand 4 hours and walk 4 hours)."  R. 24.

At step five, based on vocational expert testimony, the ALJ found that Ms. Osburn could perform her past relevant work as a telemarketer.  R. 25.  Considering Ms. Osburn's age, education, work experience, and RFC, the ALJ also found that there are other jobs that exist in significant numbers in the national economy that she could perform.  R. 26.  Specifically, through the testimony of the vocational expert, the ALJ found that Ms. Osburn could also perform the positions of "dining room attendant," "dishwasher," "fast food worker," and "cashier."  R. 26–27.

Ms. Osburn contests the ALJ's opinion for three reasons.  First, she asserts that at step four the ALJ incorrectly weighted Dr. Weingarten's opinion.  *Id.* at 25.  Second, she asserts that the ALJ failed to include limitations related to all of her impairments when calculating her RFC. ECF No. 14 at 17.  Specifically, she contends that the ALJ failed to consider the limitations that Ms. Osburn alleged regarding her ability to handle and finger with her right hand, as well as the limitations identified by Dr. Weingarten regarding her ability to sit, stand, and walk.  *Id.* at 18.

Third, Ms. Osburn asserts that the ALJ erred in failing to include her right hand limitation in a hypothetical to the vocational expert and finding that she could do her past relevant work as a telemarketer.  *Id.* at 21–22.

## ANALYSIS

### A.  **Weight of Dr. Weingarten's Opinion**

Ms. Osburn argues that the ALJ erred in giving little weight to the medical opinion of Dr. Weingarten.  ECF No. 14 at 25.  Dr. Weingarten examined Ms. Osburn once on December 20, 2017 at the request of the SSA, and therefore was not a treating physician.  R. 966–78; *Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003) ("A physician's opinion is deemed entitled to special weight as that of a 'treating source' when he has seen the claimant 'a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment.'") (quoting 20 C.F.R. § 416.927(d)(2)(i), (ii)).  His report as an examining physician was the only medical-source opinion submitted for the ALJ's review.

An ALJ should generally give greater weight to an examining source than a non-examining source.  20 C.F.R. § 416.927(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").  However, an examining medical-source opinion "may be dismissed or discounted" if the ALJ properly evaluates the factors set out in 20 C.F.R. § 404.1527(c) and § 416.927(c) and provides "specific, legitimate reasons for rejecting it."  *See Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (citing *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003)) (internal quotations omitted).  The evaluation should consider (1) whether the provider had an examining relationship; (2) whether the provider had a treatment relationship, taking into account (i) the length of the treatment relationship and the frequency of examination and (ii) the

nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record; (5) the specialization of the provider in the area; and (6) "other factors" raised by the claimant.  20 C.F.R. § 404.1527(c).

In addition to reviewing at least some of her medical records, Dr. Weingarten physically examined Ms. Osburn and took x-rays of her right wrist and hand, right hip, lumbar spine, and both shoulders.  R. 969–72.  He provided an opinion that Ms. Osburn had limited function in her right hand and "chronic low back symptomatology" that "limit[ed] her substantially."  R. 972. Noting that she was "limited in her ability to sit or stand for prolonged periods," he advised that Ms. Osburn could sit or stand for only thirty minutes at a time and walk for only ten minutes at a time, although he estimated that she could sit for up to four hours, stand for up to four hours, or walk for up to four hours total during an eight-hour workday.  R. 972, 974.  Dr. Weingarten further advised that Ms. Osburn needed a cane to walk more than thirty feet, noting that "[patient] reports multiple falls if not using cane."  R. 974.  He estimated that Ms. Osburn's limitations were first present in 2012 and 2016 and that they had lasted or would last for twelve consecutive months.  R. 978.

The ALJ assigned "little weight" to Dr. Weingarten's opinion.  R. 24–25.  She explained that he examined Ms. Osburn only once and "seem[ed] to be placing significant reliance on the claimant's subjective complaints, as exam findings were not particularly significant nor is there any apparent basis for the medically necessary cane, other than the fact that the claimant brought one to the exam and used it."  R. 24–25.  The ALJ stated that "[c]ane use is not shown in other treatment records both before and after this exam" and found that Dr. Weingarten's assessment that Ms. Osburn could "be on her feet up to 8 hours in an 8-hour workday (stand 4 hours and walk 4 hours)" contradicted his conclusion that it was medically necessary for her to use a cane.

R. 24.  She also noted that it was unclear how Dr. Weingarten arrived at 2012 and 2016 as the times at which Ms. Osburn's limitations began.  *Id.*  Due to this lack of clarity and the fact that Dr. Weingarten only examined Ms. Osburn once, the ALJ concluded that his opinion regarding these onset dates was "vague and assigned little weight."  *Id.*

The ALJ cited specific, legitimate reasons for her decision to assign little weight to Dr. Weingarten's medical-source opinion.  R. 24–25.  First, although the ALJ did not explicitly address the factors that she must consider when evaluating a medical-source opinion, she explained that she gave little weight to Dr. Weingarten's estimation of when Ms. Osburn's limitations began due to his failure to explain that opinion, a decision consistent with the SSA's regulatory guidance.  20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

Second, she specified that she reduced the weight given to Dr. Weingarten's overall opinion due in part to the fact that Dr. Weingarten saw Ms. Osburn only once.  R. 24.  Her consideration of the limited nature, extent, frequency, and length of the treatment relationship between Ms. Osburn and Dr. Weingarten in reducing the weight given to Dr. Weingarten's opinion is similarly consistent with SSA guidelines.  *See id.* §§ 404.1527(c)(1), 404.1527(c)(2)(i)–(ii).

Third, the ALJ also based her decision on her finding that Dr. Weingarten "seemed to rely heavily on the claimant's complaints," because these complaints "were not fully supported by the objective exam" and his recommendation for a medically necessary cane was inconsistent with the record and with other elements of his own opinion.  R. 24–25.  A physician's reliance in part on a claimant's subjective reports in drawing some of his conclusions does not provide reason to discount his opinion on its face.  *See Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1177

(10th Cir. 2014).  In *Knight ex rel. P.K. v. Colvin*, the Tenth Circuit concluded that though

"subjective reports do not constitute 'medically acceptable clinical and laboratory diagnostic

techniques' and can support giving a treating physician's opinion less than controlling weight,"

the subjective reports in question were "consistent and pervasive throughout the record," and

"the ALJ did not expressly reject any of these reported behaviors or discuss how they failed to

support" the treating physician's finding of impairment.  *Id.* at 1177.  Here, however, the ALJ

found Ms. Osburn's subjective reports to be "varied and inconsistent" throughout the record and

expressly described how the evidence did not support Dr. Weingarten's finding that Ms. Osburn

needed a cane to walk more than thirty feet.  R. 23–24.  This rationale for assigning Dr.

Weingarten's overall opinion little weight is therefore valid.

Further, as I discuss in more detail below, the ALJ appropriately considered the

"supportability" and consistency of the opinion in concluding that it was based heavily on Ms.

Osburn's subjective reports.  *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source

presents relevant evidence to support a medical opinion, particularly medical signs and

laboratory findings, the more weight we will give that medical opinion."); *id.* § 404.1527(c)(4)

("Generally, the more consistent a medical opinion is with the record as a whole, the more

weight we will give to that medical opinion.").

Though I can imagine "a factfinder reaching a different view about how much weight to

give" Dr. Weingarten's assessment overall, on this record I "cannot say this factfinder lacked for

evidence in reaching the decision [she] did."  *Tarpley v. Colvin*, 601 F. App'x 641, 644 (10th

Cir. 2015) (unpublished).  The ALJ has provided specific, legitimate reasons that show how Dr.

Weingarten's opinion was not entirely supported by the objective evidence and was inconsistent

with the record.

Ms. Osburn disagrees, contending that the ALJ erred by failing to specifically address the limitation that Dr. Weingarten found with respect to Ms. Osburn's right hand.  ECF No. 19 at 4. The requirement that the ALJ must provide specific and legitimate reasons does not obligate the ALJ to provide specific and legitimate reasons for discounting or adopting each individual impairment found within a medical source opinion.  *See e.g.*, *Hamilton v. Sec'y of Health & Human Servs. of U.S.*, 961 F.2d 1495, 1500 (10th Cir. 1992) (finding ALJ had given specific and legitimate reasons for rejecting entire opinions); *Boss v. Barnhart*, 67 F. App'x 539, 542 (10th Cir. 2003) (unpublished) (finding ALJ's rejection of a medical opinion specific and legitimate when ALJ found "it was unsupported by medical testing and appeared to be based on plaintiff's subjective complaints.").  Nor do Ms. Osburn's cited cases hold otherwise.  Ms. Osburn cites *Chapo v. Astrue*, in which the Tenth Circuit held that the ALJ gave insufficient reasons for discounting a treating source opinion.  682 F.3d at 1291.  In that case, the ALJ found that the treating provider had only been seeing the claimant for two months and assigned the opinion little weight on that basis alone.  The court concluded that the ALJ's reason was sufficient to justify weighing the opinion as an examining source rather than a treating source but was not a basis for rejecting the opinion entirely.  *Id.*  In contrast, here the ALJ did not base her assessment solely on Dr. Weingarten's status as an examining physician and "gave acceptable reasons for assigning little weight to the entire [examining source] opinion," *Putnam v. Comm'r, SSA*, 789 F. App'x 694, 699 n.6 (10th Cir. 2019) (unpublished), and was not obligated to do more.  I know of no case, and Ms. Osburn has provided none, that suggest an ALJ must provide specific and legitimate reasons for discounting each element of a medical source opinion.

Ms. Osburn also contests the ALJ's characterization of Dr. Weingarten's objective examinations as "not particularly significant," arguing that Dr. Weingarten's x-rays and physical

examination actually revealed "quite severe impairments" consistent with the medical record. ECF No. 14 at 25, 29–31.  However, she does not explain why the exam results should be considered severe.  For the most part, nor does the ALJ go beyond summarizing the exam results to expressly explain how she found them to be not very significant.  R. 23–24.

The reason for this lack of explanation regarding some of the exam results is self-evident. As the ALJ noted, the x-rays taken by Dr. Weingarten showed post-surgical changes in the right shoulder but were otherwise largely unremarkable.  R. 24.  Similarly, the results of Dr. Weingarten's examinations of Ms. Osburn's left shoulder, hip, and neurological, sensory, and motor signs were all normal.  R. 23–24.

The ALJ's reasoning is less evident with regard to the other exam results, including the findings that Ms. Osburn had some weakness and pain with motion in her right shoulder, an inability to flex her right thumb, and some pain and difficulty hyperextending or laterally twisting or tilting her back, although there were no lumbar spine spasms or tenderness.  R. 23– 24.  The ALJ summarized but did not individually evaluate these findings, though she did incorporate Ms. Osburn's shoulder limitations in formulating her RFC.  R. 18.

However, the ALJ was very specific in disputing the evidentiary support for and consistency of Dr. Weingarten's recommendation that a cane was medically necessary.  She recognized in her decision that references to a cane appear elsewhere in Ms. Osburn's treatment records: in August 2015 Ms. Osburn told her PCP that she wanted a cane and in February 2017 she told physiatrist Dr. Shenoi that she had been using a cane for eight months due to frequent falls.  R. 20, 22.  But the ALJ distinguished these references to wanting a cane or reports of using a cane from "actual cane use."  R. 19.  Throughout her decision she emphasized that Ms. Osburn was never observed using a cane by any provider other than Dr. Weingarten and that various

medical providers indicated that they observed Ms. Osburn walking normally.  R. 20–22, 25.
The ALJ cited physiatrist Dr. Shenoi's observations that "neurological findings [did] not
correlate with imbalance complaints" and "[t]here was no atrophy in the back or legs" as further
evidence contradicting Ms. Osburn's reported need for a cane.  R. 22–23.

The ALJ also characterized Dr. Weingarten's opinion as stating that Ms. Osburn could
stand and walk for up to four hours each in an eight-hour workday.  R. 24.  The ALJ found that
this undermined his recommendation for a medically necessary cane and showed his opinion to
be internally inconsistent, supporting the ALJ's conclusion that he relied heavily on Ms.
Osburn's complaints.  *Id.*

However, Dr. Weingarten actually opined that Ms. Osburn needed to alternate between
sitting and standing and recommended that she could sit or stand for no longer than thirty
minutes at a time, for no more than four hours total, and walk for no more than ten minutes at a
time, for no more than four hours total.  R. 24, 972, 974.  Similarly, even if one discounts Ms.
Osburn's self-reports of cane use, the fact that she has a history of being treated for injuries
resulting from falls seems to support Dr. Weingarten's recommendation.

In sum, though there is some objective exam evidence that supports Dr. Weingarten's
opinion regarding the cane and other limitations, there is also evidence supporting the ALJ's
conclusion that the examination results were "not particularly significant."

Ms. Osburn also contends that the ALJ cherry-picked results from Dr. Weingarten's
evaluation that supported a finding of non-disability.  ECF No. 14 at 31.  She argues that
following the Tenth Circuit's decision in *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007)
an ALJ "cannot simply pick and choose from a consultative evaluation and accept only those
part[s] that are favorable to a finding of non-disability."  *Id*.  In that case the court found that the

ALJ failed to explain "why he rejected four of the moderate restrictions on [the consulting health professional's] RFC assessment while appearing to adopt the others." *Id.* In contrast, here the ALJ did not reject some parts of Dr. Weingarten's opinion while accepting others. Instead she gave little weight to Dr. Weingarten's entire opinion and therefore did not need to provide a "rationale for applying varying weights to different aspects of the . . . physician's opinion." *Rael v. Berryhill*, 678 F. App'x 690, 695 (10th Cir. 2017) (unpublished).

Ms. Osburn could argue that the ALJ cherry-picked by including a limitation on Ms. Osburn's overhead reaching in the RFC and thereby implicitly accepting Dr. Weingarten's assessment of her shoulder limitation. However, the inclusion of an overhead reaching limitation could also be supported by Ms. Osburn's testimony before the ALJ that she continued to have problems with her shoulder, as well as plenty of other medical evidence in the record. R. 46–49.

Finally, Ms. Osburn points out that as in *Chapo*, Dr. Weingarten's "findings are not opposed by those of any other medical source, much less a treating source to whom they could be presumptively subordinated." 682 F.3d at 1291. However, the *Chapo* court went on to note that "[n]or did the ALJ find that [the medical source's] findings were inconsistent with his associated examination and report or with other evidence identified from the record." *Id.* Here the ALJ found Dr. Weingarten's findings to be inconsistent both with his own examination and with other evidence in the record. R. 23–25.

Overall, the ALJ has properly evaluated the factors set out in 20 C.F.R. § 404.1527(c) and § 416.927(c) and provided specific, legitimate reasons for assigning little weight to Dr. Weingarten's opinion. Because the ALJ has provided support for her conclusion, which is not contradicted by the weight of evidence in the record, I affirm the ALJ's opinion on this ground.

B. **Step Four Errors**

Ms. Osburn argues that the ALJ failed to consider her allegedly impaired ability to finger and handle, as well as her limitations related to sitting, standing and walking when calculating her RFC.  ECF No. 14 at 18, 24.

    1.  Fingering and Handling

First, Ms. Osburn argues that the ALJ failed to consider her fingering and handling impairment.  The ALJ need not discuss every piece of evidence.  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  However "the record must demonstrate that the ALJ considered all the evidence," *id.*, and accounted for all limitations when calculating the claimant's RFC, *see* 20 C.F.R. § 404.1545 ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'").  "[I]n addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects."  *Clifton*, 79 F.3d at 1010.

Ms. Osburn points to two sources the ALJ allegedly should have considered regarding her fingering and handling impairment.  First, Ms. Osburn asserts that the ALJ failed to consider fingering and handling restrictions found by Dr. Weingarten when calculating her RFC.  ECF No. 14 at 22–23.  Because I concluded above that the ALJ complied with § 404.1527(c) and articulated specific and legitimate reasons for assigning little weight to Dr. Weingarten's opinion, I must conclude that the ALJ's decision not to include Dr. Weingarten's listed restrictions is supported by substantial evidence.

Second, Ms. Osburn asserts that other evidence in the record supports a finding that she was limited in her ability to finger and handle with her right hand.  *Id.* at 20.  Ms. Osburn noted

that on February 5, 2016 she indicated that she had tingling over all five fingers of her right hand and sometimes her hand would cramp; that on March 17, 2016 she had a post-surgical evaluation for her shoulder and was found to have moderate weakness on resisted forward flexion with the thumb pointing down on her right hand; that on May 2, 2016 she requested a pain killer because of right arm pain that radiated down to her fingertips; and finally that on May 9, 2016 she reported numbness in the tips of her fingers.  R. 456, 860, 678, 683.

It is not clear that the ALJ considered the evidence related to Ms. Osburn's alleged fingering and handling impairment or accounted for this limitation in the RFC calculation.  In rejecting Dr. Weingarten's opinion, the ALJ did not address Dr. Weingarten's opinion on Ms. Osburn's fingering and handling impairment.  R. 24–25.  This is especially notable given Dr. Weingarten's restrictive findings on the issue, such as his conclusion that the function of Ms. Osburn's right hand was "limited."  R. 972.  Nor does the ALJ address fingering and handling at any other stage in her opinion.  R. 15–27.

The ALJ was aware of the alleged impairment as required under § 404.1545, as Dr. Weingarten opined that Ms. Osburn had significant limitations in this area.  R. 972, 975.  However, the ALJ did not address whether the impairment was medically determinable, and therefore did not account for it in the RFC calculation.  In this sense, the ALJ's error occurred not at step four, as claimant alleges, but at step two in her evaluation of Ms. Osburn's medically determinable impairments.

Defendant claims that the ALJ did address the fingering and handling impairment when she discussed medical evidence about her shoulder.  ECF No. 18 at 12–13.  Defendant points to the ALJ's discussion of Ms. Osburn's normal strength in her shoulder, and to the fact that she did not seek treatment for her shoulder between 2016 and 2018.  *Id.*  Yet the ALJ's discussion of a

shoulder impairment or lack thereof does not amount to consideration of whether Ms. Osburn had a fingering and handling impairment.  Rather, this appears to be an improper post-hoc justification of the ALJ's failure to discuss the fingering and handling impairment.  *See, e.g.*, *Luzier v. Astrue*, No. CIV.A. 10-1186-JWL, 2011 WL 2470243, at *8 (D. Kan. June 20, 2011) (remanding decision because the ALJ failed to consider whether an impairment, supported by some evidence in the record, was medically determinable).

Defendant argues that the ALJ was not required to "discount every discrete element of a single opinion where, as is the case here, the ALJ discounted Dr. Weingarten's entire opinion." *Id.* at 12.  It is true that the ALJ need not address every piece of evidence, but this does not excuse the ALJ from considering pieces of evidence that support an impairment that would substantially alter her opinion.  Ms. Osburn's alleged fingering and handling impairment, if medically determinable, would impact her RFC and step five determination in ways unrelated to her shoulder condition.  For example, at the hearing, the vocational expert testified that "fingering was frequent" and "handling was occasional" in Ms. Osburn's previous position as a telemarketer.  R. 74–75.

Given her assessment of Dr. Weingarten's opinion and the other evidence in the record, the ALJ may have found that the impairment was not medically determinable, or that it was not severe and did not impact Ms. Osburn's RFC.  But the ALJ was obligated to make this determination explicitly; defendant's post-hoc justifications will not suffice.  I remand the case for consideration of whether Ms. Osburn had a medically determinable fingering and handling impairment.

2. <u>Sitting, Standing, and Walking</u>

Ms. Osburn also points to sources the ALJ should have considered regarding her sitting, standing, and walking impairment.  First, Ms. Osburn asserts that the ALJ failed to include in her RFC restrictions found by Dr. Weingarten related to sitting, standing, and walking.  ECF No. 14 at 22.  Because I affirmed ALJ's decision to assign Dr. Weingarten's opinion little weight, I must conclude that the ALJ's decision not to include Dr. Weingarten's restrictions is supported by substantial evidence.

Second, Ms. Osburn asserts that the ALJ failed to consider other medical evidence demonstrating her limitations regarding sitting, standing, and walking.  *Id.* at 24–25.  She states that the ALJ's determination that Ms. Osburn had no sitting, standing, or walking limitations was "so out line with the medical evidence that it alone requires remand." *Id.*  However, Ms. Osburn does not develop this argument any further, nor does she point to any specific medical evidence that supports her argument.  *Id.*  "Arguments raised in a perfunctory manner . . . are waived." *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002).  Ms. Osburn waived this argument by failing to develop it further.  *See Tietjen v. Colvin*, 527 F. App'x 705, 709 (10th Cir. 2013) (unpublished) (affirming waiver when claimant's argument consisted solely of an "unspecific, undeveloped, and unsupported single sentence").

**C. <u>Step Five Error</u>**

Ms. Osburn argues that the ALJ also erred at step five in deciding that she could do her past relevant work as a telemarketer, because the ALJ did not include her fingering and handling limitations in the hypotheticals posed to the vocational expert.  ECF No. 14 at 21–22.

Above I found that the ALJ failed to consider whether such an impairment was medically determinable.  I also noted that a revision in the ALJ's opinion on this issue would directly impact the RFC and step five determination.  R. 74–75.  If, on remand, the ALJ finds that Ms. Osburn has a medically determinable fingering and handling impairment, the ALJ must also recalculate Ms. Osburn's RFC accounting for the impairment.  The ALJ must then revise her step five determination that Ms. Osburn could perform her past relevant work as a telemarketer, given the new RFC calculation.

### D.  Appointments Clause

In her reply brief Ms. Osburn argued for the first time that under the Supreme Court's decision in *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2049 (2018), the ALJ who denied her claim had not been properly appointed under the Appointments Clause.  ECF No. 19 at 6.  This Court granted defendant leave to file a sur-reply brief addressing this argument.  ECF No. 23.  Defendant filed a sur-reply, arguing that Appointments Clause claims must be administratively exhausted before a claimant can raise them before this court.  ECF No. 24.

Ms. Osburn argues that her Appointments Clause argument is timely under *Cirko ex rel. Cirko v. Commissioner of Social Security*, 948 F.3d 148, 153 (3d Cir. 2020).  ECF No. 19 at 5–6. In *Cirko*, the Third Circuit held that SSA claimants need not have administratively exhausted their Appointments Clause arguments in order to raise them in federal court.  948 F.3d at 153. However, since the filing of Ms. Osburn's reply the Tenth Circuit held in *Carr v. Commissioner, SSA* that claimants are required to have exhausted their Appointments Clause challenges before the SSA.  *See* No. 19-5085, 2020 WL 3167896, at *8 (10th Cir. June 15, 2020).

Because Ms. Osburn raised her Appointments Clause challenge for the first time in federal district court, ECF No. 19 at 5–6, she failed to exhaust that issue during her SSA

administrative proceedings.  In light of the Tenth Circuit's recent binding ruling in *Carr*, I find

that Ms. Osburn waived her Appointments Clause challenge by failing to raise it before the SSA.

## ORDER

For the reasons described above, the Court REVERSES the Commissioner's decision

denying Ms. Osburn's application for SSI and SSDI, and REMANDS for reconsideration

consistent with this opinion.

DATED this 21st day of July, 2020.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge